UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------X
MICHAEL AMARAL,                CIVIL ACTION
                               04-11778 (GAO)
         Plaintiff,

    -against-

PENN MARITIME, INC.

         Defendant.

------------------------------------------X

TRIAL BRIEF OF DEFENDANT PENN MARITIME, INC.
_____

**INTRODUCTION**

Plaintiff sues under the Jones Act, 46 U.S.C. § 688 *et seq.* and the general maritime law of the United States for alleged personal injuries he claims to have suffered on January 15, 2003 while working as an AB deckhand aboard defendant Penn Maritime, Inc.'s tug boat PENN NO. 2. Plaintiff claims that he suffered injury to his low back when he fell while climbing a ladder he had positioned on the tug boat in order to reach the dock. Plaintiff claims that the tug boat moved while he was climbing the ladder causing him to fall. Defendant contends that the credible evidence at trial will establish that plaintiff's alleged accident did not occur due to negligence on the part of defendant, or any unseaworthy condition, but as a sole result of negligence on the part of plaintiff. Further, defendant submits that the evidence will establish plaintiff did not suffer any injury as a result of the claimed accident.

1

## **FACTS**

### *Background:*

Plaintiff Michael Amaral was forty five years of age at the time of the alleged accident of January 15, 2003, which he claims left him permanently disabled and physically incapable of working. As will be set forth herein, plaintiff's claim of permanent disability is entirely at odds with all of the credible medical evidence in this case. Moreover, as of the date of plaintiff's alleged accident in this case he had spent a significant portion of his adult life allegedly disabled from a separate accident, only to return to the workforce as a deck hand in the tug boat industry. Indeed, plaintiff was involved in a work place accident in 1988 while working for Goodyear. Plaintiff, by his testimony, suffered fractures to both of his shoulders as well as his arm. Thereafter, plaintiff pursued a workers' compensation claim against Goodyear and applied for, and received, Social Security Disability benefits from the Social Security Administration. Plaintiff's Social Security Disability status was re-evaluated in about 1996, when he was determined to not be disabled. Accordingly, after being supposedly permanently disabled and receiving benefits on such grounds for approximately seven years, plaintiff returned to work in about 1999. Plaintiff worked as a deckhand aboard tug boats from between 1999 and April 15, 2003, when he stopped working for good.

### *LIABILITY:*

Plaintiff began work for Penn Maritime, Inc., a company that operates tug boats and barges in the marine transportation industry, in March, 2000 after having entered the

tug boat industry as a deck hand for the first time in 1999[1] at age 42. Plaintiff's last prior employment of any substance was in 1989, when he was injured while working for Goodyear, a company he started working for in about 1983. Prior to that time, plaintiff's record was impressive for criminal activity, including felony convictions for breaking and entry.  Plaintiff's second career, like his first, was short-lived[2].  Plaintiff worked as a deckhand, and at the time of his alleged accident was assigned to tug boat PENN NO. 2 as deckhand. As a deckhand, plaintiff worked tours of three weeks on duty and three weeks off duty.  On the day of plaintiff's accident, January 15, 2003, the tug PENN NO. 2 was in the Delaware River, in the vicinity of Paulsboro, New Jersey. The tug had dropped off a barge during the early morning hours of that date at an oil terminal to be loaded with petroleum product. After dropping off the barge, the tug boat left the dock at the oil terminal and crossed the river in order to pick up supplies. The tug returned to get ready to pick up the loaded barge in the afternoon hours of January 15, 2003. Plaintiff worked the "mate's watch," which ran 2400 hours to 0600 hours and from 1200 hours to 1800. At about 1630 hours, i.e. 4:30 p.m., the tug PENN NO. 2 had pulled up to the oil petroleum dock. Mate Thomas Heath was in navigational control of the tug and was navigating the tug from its lower wheel house, located on the "02" deck of the tug, i.e. the deck one up from the tug's main deck. Plaintiff was the deck hand on duty. Captain Raymond Neary, as was the normal procedure, had gone off duty at about 1200 hours and was in his quarters on the second deck of the tug.  Plaintiff was responsible for tying the

---

[1] Plaintiff was fired from his first job as a deckhand four months after he was hired apparently for lack of effort. Although plaintiff testified under oath that that he quit his second job as a deckhand for Moran Towing because he did not want to work with "cement" barges, this sworn deposition testimony was false. Plaintiff was actually terminated for cause for failing a Department of Transportation drug test. Plaintiff's deposition testimony is littered with falsehoods.
[2] Plaintiff appears to have lied significantly about his past work history in different fora, including in sworn documents and at his deposition.

3

tug to the oil terminal dock. The tug had pulled into the dock "port-side to," meaning with its port side closest to the dock. It was low tide and the main deck of the tug was lower than the oil terminal dock. As a result, plaintiff was required to toss the eye of a bow line from the bow deck of the tug over a bollard located on the dock. Plaintiff was able to accomplish this. After the bow line was secured, Mate Heath, a veteran tug captain, worked ahead on the bow line, utilizing it as a "spring line." A spring line serves to draw a vessel into a dock when it is worked against either forward or astern. Essentially, as the tug moves ahead the movement of the tug against the line causes the line to pull the tug into the dock. Mate Heath engaged the tug's rudder and engines so that they continued working ahead and into the dock. He then walked out of the lower wheelhouse, onto the "02" deck and looked astern. There, he observed plaintiff placing a ladder on the stern deck of the tug to the dock. According to plaintiff, he had been unable to throw the eye of the stern line over the bollard on the dock in order to secure it. As a result, he put up the ladder in order to climb to the dock so as to secure the eye of the line on the bollard.

By all accounts, plaintiff placed the ladder in an area on the tug that was wide open and did not secure the ladder in any fashion prior to attempting to climb it; plaintiff failed to place the feet of the ladder against anything that would have prevented the feet from sliding out, nor did he attempt to tie off the bottom of the ladder, or otherwise secure it, before climbing. Plaintiff also did not ask for assistance.  Plaintiff began to climb the ladder and after almost reaching the dock he fell. Accordingly to plaintiff, and not all that surprisingly, the feet of the ladder, which were entirely unsecured, slipped out away from the dock and toward the center of the tug, causing him to fall backwards.

4

Plaintiff claims he fell onto his back.

Plaintiff had positioned the ladder just a few feet astern of an area where the house of the barge was located on the tug. The house of the tug is the structure on the tug that houses the engine room, galley, quarters and wheelhouse. The house occupies the center of the tug boat, fore and aft but on both its port and starboard sides there is a passageway that allows passage on the tug boat's main deck between the house and the tug's rail, fore and aft. The passage way is about two to three feet wide. According to Mate Heath, and Capt. Neary, plaintiff should have placed the ladder in the port passageway with its feet against the port side of the house in order to secure the feet of the ladder before he ascended it. In fact, Mate Heath testified at his deposition that as he came out on the 02 deck he saw where plaintiff had placed the ladder and started to yell at him that he had placed the ladder in the wrong place. Mate Heath's advise, however, was too late as plaintiff had already started up the ladder. Plaintiff conceded at his deposition that he had placed ladders against the house for the very purpose of "chocking" the feet of the ladders in order to keep them from slipping on "many" prior occasions. He further conceded that on the date of the accident the feet of the ladder slipped toward the center of the tug, i.e. precisely where the house of the tug would have been preventing such slippage had he placed it there.

After plaintiff fell he got to his feet, placed the ladder where he should have placed it originally – with its feet against the house of the tug – and ascended it with no problem.

Captain Neary testified that he heard a crash while in his quarters and believed that it was caused by a ladder that had been placed against the dock falling; he was not

5

aware Amaral had been on the ladder. By the time he came out of his quarters and was informed by Mate Heath that Amaral had fallen, plaintiff had already repositioned the ladder and climbed up to the dock and back to the tug. Both Capt. Neary and Mate Heath also observed, however, that the ladder was too short to reach above the dock from the main deck of the barge. Both officers testified that the tug was equipped with several ladders of different lengths and that the ladder selected by Amaral was the shortest of the ladders aboard the tug. They both testified that a ladder is supposed to reach at least three feet above the dock, but the ladder selected by Amaral did not reach above the dock, but was resting against the face of the dock when he fell. Capt. Neary testified that all plaintiff needed to do to obtain a proper ladder for the job was to climb to the 02 deck of the tug and untie it from where it was secured. Accordingly, not only did plaintiff fail to position the feet of the ladder against the house of the tug to keep the ladder from slipping, he also selected a ladder that was too short to extend above the dock, with the result that it was merely resting against the face of the dock. In short, plaintiff's actions virtually guaranteed that the ladder would slip out as he climbed it.

Plaintiff claimed that he failed to place the ladder in the vicinity of the house because the main deck in that area was not level. This is, of course, belied by the fact that he placed it there immediately after the accident when he was able to successfully climb the ladder to the dock, and back. Further, Mate Heath, an eyewitness, testified that the area where the house was located was in fact level. In addition, plaintiff has conceded that he placed the ladder in that very position "many" times before the date of the accident. Plaintiff also claims that the ladder he selected extended above the dock. His testimony in this regard is in contrast to that of both Capt. Neary and Mate Heath.

6

In attempting to establish liability on the part of defendant, plaintiff claims that the tug "pulled away" from the dock causing the ladder to move. Plaintiff, however, conceded at his deposition that Mate Heath was standing outside of the lower wheel house with the tug working against the dock at the time of his accident. This, of course, means that Mate Heath, having engaged the tug's rudder and engines to work ahead and against the dock could have done nothing to move the tug away from the dock. Under plaintiff's alleged version of the facts, Mate Heath would have had to have seen him start to climb the ladder and then inexplicably enter the wheelhouse and purposely pull away from the dock despite knowing plaintiff was climbing the ladder – a ridiculous, factually unsupported allegation. Further, plaintiff is unable to state how, allegedly, the tug was caused to move from the dock. Plaintiff has presented absolutely no evidence of negligence or of any unseaworthy condition, and plaintiff has no expert testimony supporting any such finding. Mate Heath denies that the tug moved at all.

*DAMAGES:*

Plaintiff informed Capt. Neary that he hurt his shoulder or upper arm. Capt. Neary arranged for plaintiff to be taken by cab to the nearest hospital, Underwood Memorial Hospital[3]. There, plaintiff, after informing hospital personnel that he had fallen on his shoulders and back, stated that he had pain to both shoulders. X-rays were taken of

---

[3] Plaintiff also informed health care professionals at Underwood Memorial Hospital that he had a history of substance abuse. This admission is significant in this case since, as will be demonstrated herein, plaintiff, since May, 2003 has been prescribed massive amounts of Percocet on a monthly basis, over concerns of his treating physician and primary care physician that he was addicted to this narcotic medication. Plaintiff has been prescribed this medication solely as a result of his subjective complaints of pain, which constitute, in this case, a secondary gain motive for plaintiff in claiming disabling pain, despite the absence of any objective evidence supporting that he should be suffering from such pain. Further, plaintiff never informed his treating physician of his problem with substance abuse. According to his treating physician, Richard Jaslow, M.D., this information would have affected the manner in which he treated plaintiff. Further, plaintiff was terminated by another tug boat employer, Moran Towing, for failing a Department of Transportation drug test.

plaintiff's cervical spine and shoulders. The x-rays were negative for new injuries and plaintiff was diagnosed with a "contusion" to his shoulder. The emergency room records contain no findings of any bruises, abrasions, swelling, or any other signs of trauma. No complaints were made by plaintiff of low back pain and, in turn, no diagnostic testing of plaintiff's low back was performed in the emergency room. Plaintiff was discharged from the emergency room with a note from the hospital indicating he was fit for "light duty."

Plaintiff returned to the tug boat and resumed his normal duties as a deck hand as the tug sailed later that day to Baltimore, Maryland. Plaintiff left the tug when his relief arrived for him while the vessel was in Norfolk, Virginia on January 18, 2003.

Plaintiff was off duty on regular time off from between January 18, 2003 and February 4, 2003, when he returned to work aboard the tug PENN NO. 2. Plaintiff sought no medical treatment during that period of time. Plaintiff worked continuously aboard the tug boat performing his normal duties as a deck hand until April 15, 2003 – a period of about two and a half months. During this time, plaintiff was fully fit for duty. On April 15, 2003 plaintiff, after leaving work and without complaining of injury while at work, went to the emergency room at St. Vincent's Hospital in Staten Island, New York, where he complained of low back pain, which he indicated had started two days earlier. Plaintiff was diagnosed with a low back sprain and discharged. On May 6, 2003 plaintiff was seen by Richard Jaslow, M.D., an orthopedist in Dartmouth, Massachusetts. Plaintiff was treated by Dr. Jaslow from January, 1989, in conjunction with plaintiff's work place injuries while working for Goodyear, well into the mid to late 1990s. Dr. Jaslow operated on plaintiff during this period of time on at least two occasions. Further, during this period plaintiff was determined to be disabled from work by the Social Security

8

Administration and did not work in any capacity from between 1989 and approximately 1999. When plaintiff saw Dr. Jaslow on May 6, 2003, he misinformed him that he had injured his low back on January 15, 2003. Dr. Jaslow, who has treated plaintiff from between May 6, 2003 to present, allegedly for low back pain claimed by plaintiff, took x-rays of plaintiff's low back, which he read as being entirely normal. Dr. Jaslow has testified that from the time he first treated plaintiff for his alleged low back pain until present, every orthopedic examination he has performed of plaintiff has been entirely normal. He diagnosed plaintiff with a low back sprain based exclusively on the history provided by plaintiff and plaintiff's subjective complaints of pain, and referred plaintiff for an MRI. Despite plaintiff's normal examination, Dr. Jaslow prescribed to plaintiff 80 Percocet for purported pain. Dr. Jaslow conceded that had he known of plaintiff's substance abuse problem it would have very substantially impacted his decision to prescribe plaintiff Percocet on May 6, 2003, or thereafter.

The MRI of plaintiff's low back performed in May, 2003 revealed that plaintiff had degenerative disc disease at three levels in his lumbar spine, L3-4, L4-5 and L5-S1. Dr. Jaslow, as well as two doctors who have examined plaintiff on behalf of defendant as a result of this law suit, Benjamin Rosenstadt, M.D., an orthopedic surgeon in New York, and Charles Dicecca, M.D., an orthopedic surgeon in Qunicy, Massachusetts, stated unequivocally that the degenerative disc disease depicted by MRI in plaintiff's lower back long pre-existed the accident of January 15, 2003 and is "mild" or "moderate" in nature. Dr. Jaslow further admitted, consistent with the other doctors, that there was no evidence of any trauma to plaintiff's low back, and conceded that he treats many people in his practice with similar x-ray evidence of degenerative disc disease who are able to

work in jobs involving manual labor.

Dr. Jaslow testified that plaintiff was sent by him for physical therapy during the summer of 2003, which he successfully completed, which was followed by specialized physical therapy known as "work hardening," and is designed to condition individuals to return to work. Plaintiff's physical therapist determined that he had successfully completed the work hardening program and was able to return to work by September, 2003. Plaintiff, however, never returned to work. Dr. Jaslow testified that the only reason plaintiff has not returned to work are his subjective complaints of pain in his low back. He has further testified that plaintiff is not disabled and that although he encouraged plaintiff to consider vocational retraining, plaintiff made no effort to do so. Dr. Jaslow conceded that plaintiff provided an inconsistent history to him than plaintiff had provided to the physical therapist to whom Dr. Jaslow referred plaintiff regarding his supposed low back injury. Plaintiff, consistent with the records of the emergency rooms he visited on January 15, 2003 and April 15, 2003, and his return to work for two and a half months after the accident, informed the physical therapists that he first started experiencing low back pain on or about April 15, 2003. According to Dr. Jaslow, had plaintiff informed him that he had suffered low back pain two and a half months after the accident he could not have rendered a medical opinion relating the accident to the pain complaints of plaintiff[4].

---

[4] Plaintiff's history to Dr. Jaslow was not only misleading as to when it first started after January 15, 2003, but plaintiff mislead every health care professional that treated or examined him after the accident regarding his history of low back pain predating the accident. While plaintiff has consistently denied to health care professionals, and under oath at his deposition, that he ever suffered low back pain before the accident, medical records establish otherwise. Plaintiff was seen in November, 1998 for complaints of "chronic low back pain" at the Greater New Bedford Community Health Center, and thereafter was sent for x-rays of his low back at St. Luke's Hospital. At that time, plaintiff stated that he had suffered from low back pain for about one year and that the pain prevented him from working. Plaintiff has lied to every person associated with this case about having never suffered from low back pain prior to January 15, 2003.

Dr. Rosenstadt examined plaintiff in December, 2003 and determined at that time he was fit to return to work as a deck hand aboard tug boats without restriction. Dr. Rosenstadt further determined that there was no medical indication for continued use of narcotic pain medication and testified that Percocet was appropriately prescribed only in the near aftermath of traumatic injury for a short period of time and that prolonged use of that drug for treatment of pain was contrary to sound medical practice due to the addictive nature of the drug. Dr. DiCecca determined that plaintiff suffered no injury to his low back on January 15, 2003 and that he is not disabled from working in any capacity.

Dr. Jaslow also conceded that secondary gain motives had to be considered in evaluating plaintiff's claims in this case. Such motives included plaintiff seeking financial remuneration in this litigation, his seeking disability benefits from Social Security Disability, and his seeking of narcotic pain medication for a long time. Plaintiff, despite the complete absence of any objective signs that he suffers from any disabling injury, has not worked since April 15, 2003. Plaintiff testified at his deposition that he has taken no steps whatsoever to return to the work force in any capacity. Instead, plaintiff has applied for Social Security Disability benefits. Further, plaintiff, despite his treating physician, Dr. Jaslow, and his primary care physician, Dr. Lippcott, expressing concern over his continued use of Percocet has continued seeking the drug since May, 2003. Plaintiff, after originally being prescribed 80 Percocet a month by Dr. Jaslow in May, 2003, had his prescription increased to 100 tablets per month in March, 2005. Accordingly, there is strong evidence that plaintiff's motive in claiming pain, and thus disability, unaccompanied by any objective findings supporting such claims, is to garner

financial benefits by way of disability benefits and a damage award in this law suit, and to obtain prescription drugs.

**APPLICABLE LAW:**

Plaintiff brings suit under the Jones Act (46 U.S.C. § 688 *et seq*.) and the general maritime law of the United States pursuant to the doctrine of "unseaworthiness." To prevail under the doctrine of unseaworthiness, a seaman must establish that the vessel, or its equipment, was not reasonably fit for its intended use. *Ferrara v. A.V. Fishing, Inc*., 99 F.3d 449, 453 (1st Cir. 1996). "The standard is not perfection, but reasonable fitness; not a ship that will weather every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." *Ferrara v. A.V. Fishing, Inc*., 99 F.3d at 453, *quoting Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550 (1960). To prevail a plaintiff must establish "…that the unseaworthy condition was the sole or proximate cause of the injury sustained." *Ferrara v. A.V. Fishing, Inc*., 99 F.3d at 453. In order to recover on a Jones Act cause of action, a plaintiff must allege and show that the employer was negligent and that this negligence contributed to plaintiff's injury. *Del Valle v. Marine Transport Lines, Inc.,* 582 F.Supp. 573, 577 (D. P. R. 1984); s*ee generally, Bennett v. Perini Corporation,* 510 F.2d 114, 117 (1st Cir.1975); *Peymann v. Perini Corporation,* 507 F.2d 1318, 1324 (1st Cir.1974), *cert. den.,*421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975); M. Norris, *The Law of Maritime Personal Injuries,* 163-168 (3rd Ed.1975). For the employer to be liable under the Jones Act it is not sufficient that an accident has occurred. *Caldwell v. Manhattan Tankers Corp.,* 618 F.2d 361, 363 (5th Cir.1980). Rather, it is an indispensable element

of recovery under the Jones Act that the employer be at "fault". *Del Valle v. Marine Transport Lines, Inc.,* 582 F.Supp. at 577. *Kernan v. American Dredging Co.,* 355 U.S. 426, 432, 78 S.Ct. 394, 398, 2 L.Ed.2d 382 (1958). To be at fault the employer must have breached some duty of care so as to have created a dangerous condition. *Del Valle v. Marine Transport Lines, Inc.,* 582 F.Supp. at 577, *see, e.g., Spinks v. Chevron Oil Co.,* 507 F.2d 216, 223 (5th Cir.1975). Also, to be negligent, the employer must have had knowledge of the problem that created the dangerous situation. *Perry v. Morgan Guaranty Trust Co. of New York,* 528 F.2d 1378, 1380 (5th Cir.1976); *Rice v. Atlantic Gulf & Pacific Co.,* 484 F.2d 1318, 1320 (2d Cir.1973). Finally, it is clear that plaintiff has the burden of proving that the defendant was negligent and that the defendant's negligence caused plaintiff's injury. *Del Valle v. Marine Transport Lines, Inc.,* 582 F.Supp. at 577; *Traupman v. American Dredging Co.,* 470 F.2d 736 (2d Cir.1972); *In re Atlass' Petition,* 350 F.2d 592 (7th Cir.1965), *cert. denied,* 382 U.S. 988 (1966).

Plaintiff in the instant case is unable to establish a *prima facie* case of unseaworthiness against Penn Maritime. Plaintiff makes no allegations in this case that the vessel or its equipment were unreasonably fit for their intended purpose. To the contrary, it appears plaintiff's claim is that the vessel moved while he was ascending the ladder from the tug to the dock causing him to fall. Plaintiff testified at his deposition that the accident allegedly occurred because "[t]he boat pulled away from the dock." Accordingly, plaintiff simply cannot make out a case for unseaworthiness.

Plaintiff's claim for negligence is premised exclusively upon the claim that the tug inexplicably moved away from the dock while plaintiff was climbing the ladder. This claim is disputed in its entirety by defendant. Mate Thomas Heath, an experienced tug

boat captain, testified that after the bow line had been put out he worked against the bow line, using it as a spring line to pull the tug into the dock. After accomplishing this, he positioned the tug's rudder and engaged its engines so that the tug continued working into the dock and ahead on the bow line, with the result that the tug was kept against the dock. Mate Heath further testified that he was standing outside the lower wheel house at the time plaintiff started climbing the ladder. Plaintiff conceded at his deposition that when he started to climb the ladder Mate Heath was standing outside the wheel house and that tug was against the dock. Plaintiff, thus, will necessarily have to claim to support his theory of liability that Mate Heath, after observing him start to climb the ladder, inexplicably entered the wheel house and "pulled away" from the dock. Such a claim, which not surprisingly is flatly denied by Mate Heath, makes no sense and would require nothing short of callous intentional conduct on the part of Mate Heath. The evidence at trial will establish quite clearly that plaintiff simply positioned the ladder in the wrong place, despite knowing better. While plaintiff has conceded that he typically placed the ladder so that its feet would abut against the house of the tug, he failed to do so on the date of his accident. Plaintiff testified that prior to the day of the accident he had positioned the ladder with its feet against the house of the tug on "many" occasions so that the feet would be "chocked," i.e. prevented from sliding out. He further conceded that he failed to do this on January 15, 2003, with the result that the "ladder slid out from under" him "because the feel of the ladder weren't [chocked] any where." The accident implicates nothing but negligence on the part of plaintiff. Under the facts of this case, judgment as a matter of law is required in favor of defendant. *See Del Valle v. Marine Transport Lines, Inc.,* 582 F.Supp. at 577.

In addition, plaintiff is unable to establish damages. There is simply no objective evidence that plaintiff suffered any injury as a result of the fall occurring on January 15, 2003. The emergency room records from the date of the accident contain no findings of any objective injury. In fact, plaintiff is diagnosed as having suffered a "contusion" to his shoulder. As plaintiff's treating physician, Richard Jaslow, M.D. has testified, a contusion is properly diagnosed where a patient relates receiving a direct blow to any part of his body, with or without evidence of injury. In the instant case, there is simply no record, or testimony, documenting plaintiff suffered any objective signs of injury. Further, as to the claimed injury involved in this law suit, i.e. low back pain caused by aggravation of pre-existing degenerative disc disease, there is no objective evidence that plaintiff suffered any injury, or aggravation and, instead, the evidence strongly suggests otherwise. Plaintiff did not complain of low back pain until three months after the alleged accident. Dr. Jaslow conceded that under such circumstances it can be established that the accident caused the low back pain. Dr. Jaslow was also never informed of plaintiff's prior history of "chronic low back pain." Further, Dr. Jaslow conceded that all of his examinations of plaintiff have been perfectly normal and that his complaints of pain are purely subjective. Finally, by all accounts, plaintiff is not disabled. In short, there is no evidence supporting a claim for damages by plaintiff.

Against that backdrop, there is ample evidence of plaintiff's motive to fabricate injury for purposes of obtaining, improperly, financial and other gain. Plaintiff, despite an utter absence of credible, objective evidence establishing he suffered any injury, has simply refused to return to work, in any capacity. Plaintiff at the same time has pursued a

claim for disability benefits with the Social Security Administration, and has habitually sought, and received, narcotic pain medication from his treating physician, against medical advice. Evidence of wrong acts to establish motive is admissible. Federal Rule of Evidence 404 (b); *McGrath v. Consolidated Rail Corp.*, 136 F.3d 838 (1st Cir. 1998).

Further, there will be no evidence in this case supporting plaintiff's claim that he is totally disabled from work and accordingly, plaintiff will be unable to establish past or future lost earnings. Plaintiff's treating physician, Dr. Jaslow, has clearly testified that plaintiff is not disabled. According to Dr. Jaslow, while plaintiff's subjective complaints of pain have kept him from returning to work as a deckhand, he is not disabled from working. Drs. Rosenstadt and Dicecca are of the opinion that plaintiff may return to work as a deckhand and could have at any time. Plaintiff will not present evidence from a vocational expert or an economist. Accordingly, there will be simply no evidence supporting a claim of past or future lost wages since by every physician's testimony, plaintiff is not disabled.

## CONCLUSION

Defendant Penn Maritime, Inc. will be entitled to judgment as a matter of law at the conclusion of plaintiff's case.

Dated:    March 23, 2006

                                        Attorneys for Defendants

                                        By:   /s/ Gino A. Zonghetti
                                                Gino A. Zonghetti
                                                  (GAZ-2647)
                                                Kenny, Stearns & Zonghetti
                                                26 Broadway
                                                New York, New York 10004
                                                (212) 422-6111

        By: /s/ Timothy R. McHugh
           Timothy R. McHugh
           B.B.O. No. 335480
           135 Great Plain Avenue
           Wellesley MA 02482
           (617) 593-5405

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 24, 2006.

    */s/Timothy R. McHugh*
    Timothy R McHugh
    B.B.O. #335480
    135 Great Plain Avenue
    Wellesley MA 02482
    (617) 593-5405